**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | * | |
| | | |
| FAMILY OF CARE REAL ESTATE | * | Case No: 24-18782-LSS |
| HOLDING CO., INC. | | |
| CHARLES COUNTY NURSING AND | * | Case No: 24-18784-LSS |
| REHABILITATION CENTER, INC. [1] | | (Chapter 11) |
| | * | (Joint Administration Requested) |
| Debtors | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR AN ORDER (I)
APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II)
<u>GRANTING RELATED RELIEF</u>**

Family of Care Real Estate Holding Co., Inc. ("FOCRE") and Charles County Nursing

and Rehabilitation Center, Inc. ("CCNRC"), the debtors and debtors-in-possession in the above-

captioned chapter 11 cases (together, the "<u>Debtors</u>" or "<u>Sagepoint</u>")[1], by their undersigned

counsel, pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code (11 U.S.C.

§§ 101, *et seq.*) (the "<u>Bankruptcy Code</u>"), Rules 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 6004-1 of the Local Bankruptcy Rules

of the United States Bankruptcy Court for the District of Maryland (the "<u>Local Rules</u>"), hereby

move the Court (the "<u>Sale Motion</u>") for the entry of an Order, substantially in the form of

proposed Sale Order submitted herewith as **<u>Exhibit A</u>**, (I) approving the sale of certain of the

Debtors' assets constituting their skilled nursing facility to 10200 La Plata Opco, LLC (the

"<u>Purchaser</u>") pursuant to the terms of the Asset Purchase Agreement dated as of January 11,

2024, as amended, a copy of which is attached as **<u>Exhibit B</u>** (the "**<u>Purchaser APA</u>**"), free and

clear of liens, claims,  encumbrances,  and interests (the "<u>Sale</u>");  and (II) granting related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of*

*Terry Weaver in Support of First-Day Motions* [Doc. No. 4] (the "<u>Weaver Declaration</u>").

---

[1] The Debtors seek joint administration of their chapter 11 cases, which request is pending. [Motion for Joint
Administration, Dkt. 10 filed in CCNRC's case].

The proposed sale will pay all of the Debtors' creditors in full, and will allow the Debtors to retain the vast majority of their real property and two remaining adult day care and assisted living businesses.  It will also enable the Debtors to quickly exit chapter 11, thus preserving estate resources and minimizing the disruption to the Debtors' (and its SNF lessee's) staff, patients, and operations.

## PROVISIONS HIGHLIGHTED
## PURSUANT TO LOCAL RULE 6004-1(b)

As explained below, the Purchaser executed the APA with the Debtors after a multi-year, exhaustive marketing effort by the Debtors to sell the skilled nursing facility described below. These marketing efforts involved two professional brokers both highly skilled in the particular market for skilled nursing homes. The proposed sale price exceeds the Debtors' liabilities by approximately $10 million, and includes only the Debtors' skilled nursing facility; the Sale excludes the Debtors' primary medical campus in La Plata, Maryland, and the Debtors' other businesses (adult day care and assisted living facilities).

| Provisions to be | Location of and Justification for Provisions |
|---|---|
| Sale to Insider | Not applicable.  Purchaser is not an insider, and is unrelated to the Debtor. |
| Agreements with Management | Not applicable.  The Purchaser APA includes no such provision. |
| Releases | Not applicable.  The Purchaser APA includes no such provision. |
| Private Sale/No Competitive Bidding | Not applicable. The Purchaser APA resulted from two separate robust marketing efforts, one in 2022 and one in 2023, which garnered multiple offers. |
| Closing and Other Deadlines | On the date ninety (90) calendar days after entry of the Sale Order |
| Good Faith Deposit | The Purchaser has made a good faith deposit of $500,000 which is being held by FOCRE, with respect to the Purchaser's ongoing lease of the SNF.  The Purchaser is obligated to make a second deposit of $250,000.00 within five (5) business days of an order approving the proposed Sale. |

| Interim Arrangements with Proposed Buyer | Pursuant to a Lease and Operations Transfer Agreement (the "OTA") the Purchaser is already leasing the SNF facility and operating the SNF, and has been doing so since April 1, 2024. The Purchaser has obtained proper licensure from the State of Maryland to operate the SNF. |
|---|---|
| Use of Proceeds | A portion of the sale proceeds will be used to pay the claim of the Lender upon closing. The balance of the sale proceeds will be received by the Debtors for payment of the administrative expenses of the estate and, upon Court approval, funding of the Debtor's Chapter 11 plan. All creditors of both Debtors are expected to be paid in full. |
| Records Retention | Seller may retain copies.  Purchaser is currently operating the SNF and thus has access to its own operations business records. |
| Sale of Avoidance Actions | Not applicable.  Avoidance Actions are excluded from the Sale. |
| Requested Findings as to Successor Liability | The Sale Motion and the Purchaser APA require a finding that the Purchaser shall have no successor liability.  See Purchaser APA; §3(b), proposed Sale Order, ¶¶W, 9. |
| Sale Free and Clear of Unexpired Leases | The Purchaser APA and Sale Motion require that the sale be free and clear of all liens, claims and interests. See Purchaser APA;§ 5, 8, 12(b); proposed Sale Order, ¶¶H, I, P, T, and 2. |
| Credit Bid | Not applicable. Debtors propose to sell the SNF through a private sale. |
| Relief from Bankruptcy Rule 6004(h) | The Debtors do not seek a waiver of the automatic stay imposed by Bankruptcy Rule 6004(h). |

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Maryland (this "Court")
has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core
proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are Sections
105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and
Local Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules.

## BACKGROUND

4.      On October 18, 2024 (the "Petition Date"), the Debtors filed voluntary petitions
in this Court for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continues to manage and operate their business as a debtors-in-
possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

6.      No official committee of unsecured creditors has been appointed.

7.      No request for a trustee or examiner has been made in this chapter 11 case.

**I.      Overview of the Debtors' Business.**

8.      The Debtors own three separate businesses and own a sixteen-acre campus
located at 10200 La Plata Road, La Plata, Maryland (the "Campus"), among other properties.
The businesses are: (i) the lease to another licensed provider of a skilled nursing facility property
and operations (the "SNF"), which is located on the Campus; (ii) an assisted living facility
located on a property separate from the Campus and also owned by FOCRE; and an assisted
living facility known as a "memory care" facility that is located on the Campus (together, the
"ALFs"); and (iii) an adult day care facility (the "ADC") also located on the Campus, of which
the ADC generates the majority of CCNRC's business.  The SNF, ALF and ADC located on the
Campus each operate in separate buildings.  The SNF facility sits on approximately one acre of
the total Campus (the "SNF Property") and includes a single building, which is accessed by a
shared parking lot that one of the ALFs and ADC also use for parking patients, visitors and staff.

9.     The Debtors are 501(c)(3) not-for-profit Maryland corporations.  FOCRE owns the Campus real estate along with the other parcel on which the memory care ALF is operated, and CCNRC owns one other parcel in La Plata, MD that is not improved and not used in any of the business operations.

10.     Sagepoint has been a reliable caretaker of seniors in the Town of La Plata  for forty eight years, since 1976.  The Debtors' parent entity, Family of Care Alliance ("FOCA"), which is also known as "Sagepoint Senior Living Services," does not separately operate any business; however, it collects from and then pays directly some shared expenses of the Debtors, constituting certain shared executive and high-level staff compensation,  which expenses are then allocated to the Debtors according to their respective obligations of the shared expense. Similarly, CCNRC pays some shared expenses of the Debtors and FOCA such as internet technology services, professional and accounting services, insurance costs and the like and then records FOCA's and FOCRE's allocated portion of those expenses on its books as a "due to" credit or "due from" debit from FOCA or FOCRE as appropriate.  Funds then transfer between the Debtors and FOCA taking into account the cash needs to fund these shared expenses and the "due to" and "due from" allocations.  Thus, while the Debtors may pay and/or advance certain allocated expenses of non-debtor FOCA, the payments ultimately are adjusted such that the Debtors ultimately fund only their own expenses.

11.     Originally formed as CCNRC, Sagepoint purchased its Campus from Charles County, Maryland, in 2009.  In 2014, it formed FOCRE and transferred all of its real estate holdings to FOCRE, with CCNRC remaining as the operating entity for all of the Debtors' businesses. CCNRC does business also as "Sagepoint" and "Sagepoint Care," and FOCRE does business as "Sagepoint Holdings."  Unlike many of its current competitors, Sagepoint is not a private-equity entity but a non-profit community-based organization that seeks to preserve affordable, quality care for the residents of its small town in Southern Maryland.  CCNRC continues to be the operating entity that operates the ADC and ALFs.

12.     As was borne out by headline after headline in 2019 and continuing thereafter, Sagepoint experienced dramatic changes, including financial and operational stresses during the Covid-19 pandemic.  Although it was ultimately successful in reversing the decision, Sagepoint initially faced significant fines by Maryland Department of Health for spurious allegations about its care.  Contrary to these allegations, Sagepoint increased its "star" rating by the Centers for Medicare and Medicaid Services ("CMS")  in the past twenty-four months, from three to four stars, prior to transferring its operations to Purchaser in April 2024.  Purchaser currently leases from the Debtors the SNF real property and all licenses and personal property used in connection with the SNF.  Purchaser pays monthly lease payments to FOCRE in accordance with the lease operations.

13.     Notwithstanding Sagepoint's demonstrated quality of care, the pandemic caused historically-high nursing and staffing costs starting in 2019.  As inflation increased throughout 2020 to 2023, with costs of nursing, staffing, food, energy and insurance on the rise, Sagepoint began operating less profitably than it historically had operated.  The increase in nursing costs was also driven by a well-documented exodus of nursing personnel during the COVID-19 pandemic and thereafter, as well as regulatory changes that eliminated staffing flexibility. Service volumes continue to remain below historic norms post-pandemic as a result of shifts in industry demands and reputational damage.  Finally, the government response to the pandemic included increased regulation for long term care providers, which further strained the profitability and viability of solely nonprofit organizations like the Debtors.  These dramatic sea changes to the skilled nursing industry caused Sagepoint's board of directors to direct its executives to sell the SNF, which sale efforts initially began in early 2022.

A.     **Sale Efforts – First Proposed Sale with Defaulting Purchaser**

14.     Sagepoint engaged multiple potential purchasers in early 2022 and began marketing the SNF for sale.

15.     In March 2022, Sagepoint selected Tryko Partners, LLC ("Tryko"), a private-equity nursing home group that operates under the entity of Marquis Health Consulting Services,

LLC ("Marquis") and is based in New Jersey.  Sagepoint obtained multiple offers for the purchase of the SNF such that Tryko was not the only potential purchaser considered.

16.     Between being selected in early 2022 and then in February 2023 when the proposed SNF sale was supposed to occur in, the United States Federal Reserve began "hiking" or increasing interest rates to historically-high rates. Immediately after Sagepoint selected Tryko's Letter of Intent, Tryko asked for a price reduction from thirty million dollars ($30,000,000.00) to twenty eight million and two hundred thousand ($28,200,000.00), which Sagepoint agreed to in early 2022.  The Debtors would later learn in discovery related to litigation with Tryko that the rise in interest rates between when Tryko and the Debtors entered into the LOI in spring 2022 and when Tryko was supposed to purchase the SNF in February 2023 (described below) was projected to cost Tryko millions of dollars in additional financing costs.

17.     After entering in the amended LOI that gave Tryko a significant discount off of its initial offer for the SNF, Sagepoint and Tryko's newly-created entity called Chapman Property, LLC (together with Tryko and Marquis, the "Defaulting Purchaser") executed an Asset Purchase Agreement (the "Tryko APA") with Sagepoint in September 2022.  The closing of the SNF sale to the Defaulting Purchaser was initially scheduled for December 1, 2022; the Defaulting Purchaser exercised two options to extend the closing date of the sale, ultimately requiring the Defaulting Purchaser to close on the SNF transaction on February 1, 2023.

18.     The Defaulting Purchaser did not close on February 1, 2023, and Sagepoint was engaged in litigation with the Defaulting Purchaser beginning in March 2023.  That matter was pending (and now stayed) in the United States District Court for the District of Maryland before the Hon. Deborah Chasanow (the "Litigation").  Because the Defaulting Purchaser claimed rights to specific performance in accordance with the Tryko APA, Sagepoint has been prevented from selling its SNF to the Purchaser, which would be able to promptly close the transaction.

**B.**      **Second Round of Marketing and Sale to Purchaser**

19.      In light of the litigation, in 2023 Sagepoint engaged a commercial broker with decades of experience to identify a viable purchaser of the SNF; that broker is Mark S. Davis, MUP, MBA, President of Healthcare Transactions Group, Inc. ("Davis").  Davis has been brokering deals in the healthcare industry for nearly thirty (30) years. Davis worked together with another broker with extensive skilled nursing facility brokerage experience named Darren Cortese ("Cortese"), who has completed the acquisition or divestiture of over 140 skilled nursing facilities with a combined value of over $500 million over the past 30 years.

20.      Davis and Cortese actively marked the SNF and received multiple offers to lease it until such time as Sagepoint could obtain a court order finding that it was not required to sell the SNF to the Defaulting Purchaser.

21.      Ultimately, Sagepoint entered into the Purchaser APA in January 2024 after extensive negotiations with the Purchaser and a review of multiple offers for the purchase of the SNF property.  At that time, Sagepoint also entered into an arrangement whereby it would lease the SNF Property to Purchaser until Sagepoint was cleared of the Defaulting Purchaser's claims to the SNF Campus and related SNF property.

22.      Purchaser made a deposit payment of $500,000.00 with respect to the Operations Transfer Agreement of the SNF and the Lease of real property; and it is obligated to make a second deposit payment of $250,000.00 once Sagepoint obtains a court order authorizing it to sell the property to Purchaser, all of which is in accordance with the Purchaser APA.

23.      Under the terms of the Purchaser APA, the Purchaser is obligated to close on the sale of the SNF within ninety (90) days of a non-appealable order finding that the Debtors are authorized to sell the SNF to the Purchaser.

24.      Given that the Purchaser entered into contract with Sagepoint for nearly the same purchase price offered by the Defaulting Purchaser while the property is subject to pending specific performance litigation; and Sagepoint obtained multiple offers for the purchase of the

SNF Property both times it marketed the SNF Property between 2022 and 2024; the marketing efforts by Sagepoint, Davis and Cortese were not only sufficient and robust, but successful.

25.     As of the Petition Date and the filing of this Motion, the Purchaser is licensed by the State of Maryland to operate the SNF and it has operated the facility since April 1, 2024. The Purchaser has been a reliable and trustworthy operator and, unlike the Defaulting Purchaser, the transactions involving both the lease and the sale transaction have gone forth smoothly and as anticipated.

26.     Sagepoint continues to operate its ADC and ALFs on its Campus.

**II.     Events Leading to Bankruptcy.**

27.     In addition to the Litigation, the Debtors also sought bankruptcy protection because one of their two credit facilities matured in June 2024.  Due to the Litigation, the Debtors were unable to consummate a sale of their SNF, which was the method by which they intended to free up proceeds to pay the matured debt to Lender.

28.     The Debtors have two outstanding credit facilities related to their businesses, both of which involve the Lender.  They are as follows:

        i.     Two revenue bonds funded by the Maryland Health and Higher Education Facilities Authority ("MHHEFA"), which were purchased by the Lender and serviced by U.S. Bank, N.A. (the "Bonds").  The total outstanding amount owed to Lender in accordance with the loan documents is not more than $5,073,621.00. The Bonds had a redemption date of June 19, 2024 (the "Redemption Date"), and thus the entire amount owed to Lender on the Bonds is past-due and owing.  Prior to the Redemption Date, the Debtors had never been in payment default with respect to any of their lending repayment obligations.

        ii.     A commercial term loan in the original principal amount of Five Million Dollars ($5,000.000.00) (the "Loan") that was initially extended by Old Line Bank, Lender's predecessor-in-interest as a construction loan to fund the construction of a rehabilitation wing for the SNF.  On or about October 15, 2019,

Old Line Bank converted the Loan to a term loan with regular recurring monthly interest and principal payments. The Loan matures on or about December 13, 2029. As a result of the redemption date having occurred with respect to the Bonds, and the total amount owed on the Bonds not having been paid in full, the Lender has also declared the Loan in default although it had previously never been in payment default. The total outstanding indebtedness in connection with the Loan is not more than $4,505,084.00

iii.    The Bonds and the Loan are each cross-collateralized.

iv.    The total outstanding indebtedness owed to the Lender is not more than $9,578,705.00.

29.    The Lender initially engaged in discussions with the Debtors to enter into a forbearance through early 2025, but the forbearance was not anticipated to extend through and after the proposed trial date for the Litigation. Thus, the forbearance period would not protect the Debtors from potential collection actions by the Lender in time for the Litigation to resolve. Furthermore, the Lender withdrew from discussions regarding a potential forbearance in August 2024. The Debtors attempted to obtain a refinance loan over the period of late 2023 through the Petition Date, but ultimately were unable to do so under commercially reasonable terms.[2] See, Affidavit of Terry Weaver, ¶ 30. As a result, the Debtors elected the filing of the above-captioned case to allow sufficient time to sell the SNF and pay the Lender in full.

30.    Because the proposed sale price of $27,500,000.00 for the SNF alone exceeds the debt to Lender by approximately $17,500,000.00, the Debtors' proposed sale will expeditiously and fully satisfy their obligations to the Lender, as further described below, as well as all other creditors.

31.    In addition to the Litigation and Lender obligations, on September 13, 2024, a driver for Sagepoint's adult day services facility was transporting patients in the morning when

---

[2] Although the Debtors have a significant amount of equity in their property, including the SNF Property and Purchased Assets, their cash flow historically has not been sufficient to enable them to obtain refinance loans/facilities.

the transport bus was involved in a fatal automobile collision with a dump truck.  Both the bus driver and two Sagepoint patients died in the crash (the "September Crash").  The accident rocked the closely-knit Sagepoint community, which has been grieving the lives of its driver and patients while also handling an onslaught of insurance, litigation and police inquiries related to the September Crash.

32.     As of the Petition Date, the police investigation into the September Crash is ongoing; however, police have stated publicly that drugs and alcohol are not believed to be an issue in the crash.  *See, https://thebaynet.com/3-killed-after-head-on-collsion-involving-dump-truck-and-senior-living-bus-in-charles-county/* ("Investigators do not believe that impairment was a factor in this crash.")

33.     In Maryland, non-medical malpractice tort claims for noneconomic damages are capped at $2,337,500.00.  Md. Code Ann., Md. Courts & Jud. Proc §11-108.   The Debtors intend to seek an estimation of the claims related to the September Crash and are prepared to submit expert testimony, if necessary, that the total maximum exposure of CCNRC in relation to the September Crash, including economic and noneconomic damages, is not more than approximately $7,200,000, exclusive of insurance coverage (which the Debtors believe will cover any asserted claims).  *See,* Affidavit of Terry Weaver, ¶ 34.

**III.    The Sale Hearing.**

34.     At the Court's hearing on this Motion (the "Sale Hearing"), the Debtors will seek approval of (i) the Sale, free and clear of all liens, claims, interests and encumbrances, pursuant to section 363 of the Bankruptcy Code, to Purchaser pursuant to the Purchaser APA, with all liens, claims, interests and encumbrances to attach to the net sale proceeds with the same validity and in the same order of priority as they attached to the (as defined in the Purchaser APA as the "Property" and defined herein as the "Purchased Assets," which include the SNF Property and all personal property required to be operated in connection with the SNF); as well as all of the SNF bed licenses and various other property described in the Purchaser  APA prior to the Sale.  The Debtors will submit and present additional evidence at the Sale Hearing demonstrating

that the Sale is fair, reasonable, and in the best interest of the Debtors' creditors and the Debtors' bankruptcy estate.

## **RELIEF REQUESTED**

35.     The Debtors respectfully request that, following the Sale Hearing, the Court enter an Order substantially in the form the proposed attached hereto as **Exhibit A** authorizing and approving the Sale, free and clear of liens, claims, and encumbrances, to the Purchaser; and granting related relief.  In connection with the Sale, the Purchaser is not assuming any of the service or maintenance contracts, vendor agreements, equipment leases, commercial leases, marketing agreements or laundry contracts or leases that relate to the Property or the Facility except as New Operator already elected to assume prepetition.  Thus, the Debtor does *not* seek approval of any assignment or assumption of any contracts in connection with the proposed sale.

## **BASIS FOR RELIEF REQUESTED**

### I.    **Section 363(b) of the Bankruptcy Code Authorizes the Sale.**

36.     Ample authority exists for approving the Sale. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This Court's power under Section 363 of the Bankruptcy Code is supplemented by Section 105(a) of the Bankruptcy Code, which provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id*.

37.     Courts review a debtor's decision to use, sell, or lease out of the ordinary course under the business judgment rule. *See In re Modanlo*, 412 B.R. 715, 732 (Bankr. D. Md. 2006) *subsequently aff'd*, 266 F. App'x 272 (4th Cir. 2008); *In re Fischer*, Case No. 03-13704, 2010 WL 2746329, at *10 (Bankr. D. Md. July 9, 2010); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtors] to show that a sound business purpose justifies such actions.' If the [Debtors'] decision evidences a sound business purpose, then the Bankruptcy Court should

approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)).

38.     Courts typically consider the following factors in determining whether a proposed sale satisfies the business judgment standard described above: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)).

39.     Once the Debtors articulate a valid business justification under the business judgment rule, there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Yost v. Early*, 87 Md. App. 364, 589 A.2d 1291, 1296-98 (1991) (applying Maryland law); *see also Continuing Creditors' Comm. Of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (articulating same presumption under Delaware law); *Lake Monticello Owners' Ass'n v. Lake*, 250 Va. 565, 571 (1995) (articulating same presumption under Virginia law).

40.     Here, there is a sound business justification for the Sale for multiple reasons. First, the proposed sale will pay all of the Debtors' creditors in full, even assuming that the Debtors are required to make distributions in the maximum theoretical amount towards the Defaulting Purchaser and the September Crash tort claimants, with over $9,000,000.00 to pay the rest of their creditors, which are described below and scheduled at less than $500,000.00 for both Debtors.  The calculation of the projected proceeds of over $9,000,000.00 is:

$27,500,000.00

($9,578,705.00) (Lender indebtedness)

($1,100,000.00) (costs of sale and commissions, estimated at 4% of purchase price; broker commission to be paid is $390,000.00)

($300,000.00) (maximum liquidated damages per Defaulting Purchaser PSA)

($7,200,000.00) (maximum statutory noneconomic damages exposure for September Crash claimants, assuming zero insurance coverage)

**$9,321,295 = Net Proceeds Available for All Other Claimants[3]**

41.     All of the remaining scheduled debts owed by the Debtors exclusive of the Lender, Defaulting Purchaser, costs of sale/commissions, and September crash claimants are, cumulatively, approximately less than $500,000.00, which includes all other scheduled debts of the Debtors along with any proofs of claim filed as of the date of this Motion.

42.     It is unquestionably within sound business judgment for Debtors to sell the SNF for a price that will yield proceeds sufficient to provide one hundred percent (100%) payment of all of their claims.

43.     Furthermore, the Debtors will retain the rest of the Campus exclusive of the SNF Property, and will continue to own and operate the ALFs and ADC, along with all of the personal property required to operate those two remaining businesses.  This is not a proposed liquidating chapter 11 situation; the Debtors will have the ability to fully reorganize and continue generating income post-closing of the proposed sale.

44.     This Court has held that a private sale without auction may be approved, particularly where the sales price achieves payment in full of all non-insider creditors.  *In re Naron & Wagner, Chartered*, 88 B.R. 85, 90 (Bankr. D. Md. 1988) ("Finally, Debtor has proffered that the proceeds from the proposed sale, when combined with other assets being

---

[3] This estimate is likely to be reduced by several million dollars, since (i) the Debtors have insurance coverage for the September Crash claims; (ii) it is the Debtors' position that they owe the Defaulting Purchaser $0 and are entitled to retain a deposit from Defaulting Purchaser of $950,000.00 that is currently held in escrow; and (iii) the projected costs of sale are likely to be well under four percent (4%).

liquidated, will be sufficient to pay non-insider creditors in full, so that only insider creditors are likely to be at risk of being adversely affected if the price was insufficient."). Here, *all* creditors will be paid in full using the sale proceeds of the proposed sale, thus the justification is even stronger than the circumstances approved in *Naron & Wagner.*

45.     Second, the Debtors and their professionals have undertaken years of marketing and have identified the Purchaser, which has demonstrated an ability to consummate a transaction with the Debtors. Purchaser has also already been licensed to operate the SNF, and currently is the entity that operates the SNF and thus is highly motivated and qualified to quickly consummate the sale. These facts weigh heavily in the Debtors' identification of Purchaser's offer as the best offer for the purchase of the SNF. *See, e.g., In re 160 Royal Palm, LLC,* 600 B.R. 119, 129 (Bankr. S. D. Fl. 2019) (in approving a private sale after the debtor withdrew the property from auction, the court noted that the highest and best offer is not necessarily the most amount of money offered, stating "The Debtor's duty is to maximize value to the creditors, and that maximization includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding." *Id.*).

46.     As for the adequacy of the purchase price, the Debtors have worked closely with Cortese and Davis to make the SNF operations and Purchased Assets an attractive investment as a going concern. Despite being embroiled in litigation with the Defaulting Purchasers and suffering post-pandemic price hikes and staff shortages nationwide, the Debtors have actually reduced the operating loss from early 2023 through the Petition Date. *See*, <u>Affidavit of Terry Weaver</u>, ¶40. Notwithstanding, the Debtors still continue to suffer losses and are now past due with respect to its obligations to Lender, which is causing the Debtors to incur default interest and other costs associated with the default due to the passage of the Bonds' Redemption Date. The sale of the Purchased Assets will allow the Debtors to shed the unprofitable SNF and focus on the ALFs and ADC, which will enable them to continue to provide critical services to the La Plata community. Accordingly, there is a strong business justification for the Sale.

47.    The Sale Process was also carefully designed to garner maximum interest in the Debtors' business and to solicit the highest and best possible offers. The Debtors and their professionals contacted numerous potential purchasers from Davis and Cortese's proprietary database of potential purchasers, and they set up a vast digital data room with information about the SNF Property and operations, which room was accessed by numerous potential purchasers during the second sale efforts. Davis and Cortese conducted numerous meetings with potential purchasers and conducted additional marketing efforts to maximize interest. Two interested parties, including the Purchaser, made formal offers for the purchase of the SNF and submitted respective letters of intent for the Debtors' consideration.  The Debtors then negotiated for several months with Purchaser to obtain an offer; to determine a lease/sale structure that was viable; and the achieve the highest maximum purchase price. The Debtors and their professionals therefore believe that the Purchaser APA represents the highest and best bid available, and that the process was appropriately designed to achieve the highest possible sale price.

48.    Because the Debtors are nonprofit organizations; and because the proposed sale to Purchaser will pay all of Debtors' debts in full with a comfortable cushion leftover; the Debtors should not be forced to subject the SNF to an auction, which will only cause additional expense and time that is unnecessary. If forced to submit the Sale to auction, the Debtors will incur additional administrative costs by prolonging their chapter 11 cases, and will also incur cost in having to obtain auctioneer(s), conduct an auction, and organize diligence information for a third time in the past two years.  This would be both futile and wasteful, and would not produce any more favorable result because Debtors believe that the Purchaser is in the best position to quickly close on the proposed Sale of the SNF Property and Purchased Assets.

49.    In addition to the foregoing, a Sale is the best option at this time for maximizing the value of the Debtors' estate and generating a return to creditors. Given the Debtors' negative cash flow despite its herculean efforts in reducing losses, the Debtors cannot obtain new financing to fund a chapter 11 plan, future capital requirements, and distributions to creditors; nor

could the Debtors attract new investors to provide new capital at the time of this Motion. *See,* Affidavit of Terry Weaver, ¶45.   Consequently, the Sale represents the a solid, certain, and viable exit plan from this chapter 11 bankruptcy and the best option for maximizing the value of the Debtors' estate and a return to creditors and other stakeholders.

**II.**    **The Sale Will Satisfy the Requirements of Section 363(f) of the Bankruptcy Code**.

50.    Section 363(f) of the Bankruptcy Code provides for a sale "free and clear" of an entity's interest in property of the estate if:

     i.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

     ii.    such entity consents;

     iii.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

     iv.    such interest is in bona fide dispute; or

     v.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.    Section 363(f) of the Bankruptcy Code is stated in the disjunctive; therefore, it is only necessary to meet one of the five conditions of section 363(f) in a sale under section 363(b) of the Bankruptcy Code. *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

52.    Here, the Debtors anticipate that any Sale will satisfy §363(f) of the Bankruptcy Code because the sales price vastly exceeds the value of the liens on the property, in accordance with §363(f)(3).

53.    The Debtors will send a sale notice to, among others, all parties who assert liens or claims against the Purchased Assets, and any holder of a claim against or interest in the

Purchased Assets who does not timely object to the Sale shall be deemed to have consented to the sale of the Purchased Assets free and clear of its claim or interest. 11 U.S.C. § 363(f)(2); *see In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG), 2018 WL 4684802 (Bank. D. Del. Sept. 27, 2018); *Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Daufuskie Island Properties, LLC*, 431 B.R. 626, 640 (Bankr. D.S.C. 2010). Moreover, the Debtors believe that any parties that object to the "free and clear" Sale will either (a) be holders of liens or claims that are subject to a bona fide dispute or (b) would be compelled to accept cash in satisfaction of their interests. 11 U.S.C. §§ 363(f)(3) and (5).

54.     Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Sale, in the same order of priority and with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and its estate may possess with respect thereto. 11 U.S.C. § 363(f)(3). Therefore, pursuant to Section 363 of the Bankruptcy Code, the Debtors may sell the Purchased Assets free and clear of all liens, claims, and encumbrances, except to the extent of any permitted encumbrances designated in the Purchaser APA.

55.     The Debtors also submit that it is appropriate to sell the Purchased Assets free and clear of any successor liability relating to the Debtors' business. Courts have consistently held that a buyer of a debtor's assets pursuant to a Section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes).

56.     The purpose of an order authorizing the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. To that

end, Purchaser should not be liable under any theory of successor liability relating to the Debtors'
business but should acquire the Purchased Assets free and clear.

57.     As to Defaulting Purchaser's specific performance claims to the Purchased Assets,
contemporaneously herewith the Debtors filed a Motion to reject the Defaulting Purchaser's APA.  In
accordance with applicable law, the Defaulting Purchaser's rights to specific performance (if any) are
terminated upon the Debtors' rejection of the Defaulting Purchaser's APA.  Accordingly, the Debtors
have satisfied the requirements set forth in Bankruptcy Code §363 as to the Defaulting Purchaser's
claims to the Purchased Assets.  *See, In re Collins*, 118 B.R. 35, 37 (Bankr. D. Md. 1990) (Declining
to follow other findings wherein final decrees had been issued before the bankruptcy petitions and
noting that "In the case *sub judice,* **the debtors filed their Chapter 12 bankruptcy**
**petition** *before* **the entry of any decree of the state court for specific performance. Under the**
**circumstances, the debtors ought to be afforded the opportunity to avail themselves of the**
**rehabilitative features of the Bankruptcy Code. There is no cause to lift the automatic stay in**
**the context of the present case, as contrasted with the cases cited by the movant.")** (emphasis
added). Other courts have followed this same reasoning as this Court.  *See, e.g.,  In re A.J. Lane & Co.*
*Inc.,* 107 Bankr. 435, 439 (determining that the right of specific performance is subordinate to
the debtor's rejection rights); *In re Waldron,* 36 Bankr. 633, 642, n. 4 (Bankr. S.D. Fla. 1984) *rev'd on*
*other grounds,* 785 F.2d 936 (11th Cir. 1986) ("The Code does not permit specific performance as a
remedy resulting from the rejection of an executory contract under section 365"); *see also, Butler v.*
*Resident Care Innovation Corp.*, 241 B.R. 37, 46-47 (D.R.I. 1999); *Sundial Asphalt Co., Inc. v. V.P.C.*
*Invs. Corp. (In re Sundial Asphalt Co., Inc.)*, 147 B.R. 72, 80 (E.D.N.Y. 1992); *Roxse Homes, Inc. v.*
*Roxse Homes Ltd. P'ship*, 83 B.R. 185, 187 (D. Mass. 1988), *aff'd* 860 F.2d 1072 (1st Cir.
1988); *Kendall Grove Joint Venture v. Martinez-Esteve*, 59 B.R. 407, 409 (S.D. Fla. 1986); *Bregman*
*v. Meehan (In re Meehan)*, 59 B.R. 380, 386 (E.D.N.Y. 1986); *In re Baver*, No. 21-10806, 2021
Bankr. LEXIS 3354, 2021 WL 5815643, at *5 (Bankr. S.D. Ohio Nov. 2, 2021); *In re Brick House*
*Props., LLC*, 633 B.R. 410, 417-23 (Bankr. D. Utah 2021); *In re Bennett Enters., Inc.*, 628 B.R. 481,
488-90 (Bankr. D.N.J. 2021); *Davidson v. Barstad (In re Barstad)*, No. 17-60586-TLM, 2019 Bankr.

LEXIS 1803, 2019 WL 2479311, at *5-7 (Bankr. D. Mont. June 12, 2019); *In re Acevedo*, 441 B.R. 428, 434 (Bankr. S.D.N.Y. 2010); *In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010); *In re Smith*, 269 B.R. 629, 631 (Bankr. E.D. Tex. 2001); *Winter v. Glaze (In re Glaze)*, 169 B.R. 956, 960 (Bankr. D. Ariz. 1994); *In re High Country Resorts*, 94 B.R. 193, 194 (Bankr. D.N.M. 1988); *Brown v. Bassett (In re Bassett)*, 74 B.R. 361, 363 (Bankr. D. Colo. 1987); *Rusiski v. Pribonic (In re Pribonic)*, 70 B.R. 596, 599-601 (Bankr. W.D. Pa. 1987) (A contract for the sale of a debtor's property is no longer executory and cannot be rejected once a court has ordered specific performance of the contract.)

### III.    Purchaser is Entitled to the Protections of Section 363(m) of the Bankruptcy Code.

58.    Section 363(m) of the Bankruptcy Code provides, in relevant part, that the reversal or modification on appeal of an authorization under Section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *E.g., Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)).

59.    The Debtors' marketing efforts and negotiations with the Purchaser were undertaken at arm's-length and without collusion, with all parties being represented or at least having the opportunity to be represented by their own counsel.  Accordingly, the Debtors' request, and will demonstrate at the Sale Hearing, that the Purchaser should be deemed a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

### NOTICE

60.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) Purchaser, (b) all entities known to have asserted any lien, claim,

interest or encumbrance in or upon any of the Purchased Assets; (c) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (d) the Defaulting Purchaser; (e) the Lender; (f) the Office of the United States Trustee; (g) the Center for Medicare and Medicaid Services; (h) the Maryland Office of Health Care Quality; (i) the Maryland Health Care Commission; (j) those parties who have filed the appropriate notice requesting notice of all pleadings filed in this chapter 11 case; and (k) all other creditors and parties in interest in this case.

<b><u>NO PRIOR REQUEST</u></b>

61.     The Debtors have not previously sought the relief requested herein from this Court or any other court.

<b><u>WAIVER OF MEMORANDUM</u></b>

62.     Pursuant to Local Rule 9013-2, the Debtors state that, in lieu of submitting a separate memorandum in support of this Motion, they will rely solely upon the grounds and authorities set forth in this Motion.

**WHEREFORE**, the Debtors respectfully request that the Court, following the Sale Hearing, grant the Motion and enter the Sale Order in substantially the form of the proposed order submitted herewith and grant such other and further relief as is just and proper.

Dated:  October 23, 2024

/s/ Catherine Keller Hopkin
Catherine Keller Hopkin, 28257
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401
(443) 569-0788
chopkin@yvslaw.com

Counsel for Debtors

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2024, notice of filing the *Motion of the Debtors and Debtors-In-Possession for and Order (I) Approving the Sale of Certain of the Debtors' Assets to PURCHASER Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* (the "Motion") was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list; and a copy of the Motion was sent by electronic mail or mailed first class, postage prepaid, as shown on the attached service list.

/s/ Catherine Keller Hopkin
Catherine Keller Hopkin

22

**The following parties received a
copy of the filing by first class mail
and/or by electronic mail:**

PNC Bank, National Association
Attn: Bankruptcy
3232 Newmark Drive
Miamisburg, Ohio  45342
bankruptcy.notices@pnc.com

Shore United Bank
Attn: Andrea Colender, Esquire
28969 Information Lane
Easton, Maryland  21601
andrea.colender@shoreunitedbank.com

WesBanco
c/o Steven L. Goldberg, Esquire
McNamee Hosea
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  20770
sgoldberg@mhlawyers.com

Canon Financial Services
14904 Collections Center Drive
Chicago, Illinois  60693-0149
contact@cfs.canon.com

Care Providers Workers Comp
c/o Riggs Counselman Michaels Downes
Attn: Finance Department
555 Fairmount Avenue
Towson, Maryland  21286

Chapman Property, LLC
c/o Amanda H. Bird-Johnson, Esquire
Williams Mullen
200 South 10th Street, Suite 1600
Richmond, Virginia  23219
abird-johnson@williamsmullen.com

Charles County Treasurer's Office
200 Baltimore Street
La Plata, Maryland  20646
treasurer@charlescountymd.gov

Charles Parker and/or his estate
27133 Birch Manor Circle
Mechanicsville, Maryland  20659

Comcast Business
Attention: Law Department-Bankruptcy
One Comcast Center
Philadelphia, Pennsylvania  19103-2838
documentfiling@lciinc.com

DB and/or the estate of DB
8207 Lakeview Drive
Pomfret, Maryland   20675

eMedicall Solutions
P. O. Box 1075
Sykesville, Maryland  21784
contact@emedicall.com

Estate of JHW
c/o April Denise Watson
3097 Huntington Circle
Waldorf, Maryland  20602

Estate of MFG
c/o Florence Lurinsky
231 Grove Street
Montclair, New Jersey  07042

Estate of PJA
c/o Kathy Winstead
9885 Penns Hill Road
La Plata, Maryland  20646

Lifeloop
P. O. Box 8500
Pasadena, California  91109-8500
info@lifeloop.com

Mike's Pest and Termite Control
10400 Theodore Green Boulevard
White Plains, Maryland  20695
info@833bugmike.com

PJ
c/o Patricia Willett
8413 Dartrey Place
Charlotte Hall, Maryland  20622

Pitney Bowes Global Financial Services
P. O. Box 981022
Boston, Massachusetts  02298-1022
bankruptcy@pb.com

Rosie Connectivity Solutions
7320 Central Avenue
Savannah, Georgia  31406
info@nurserosie.com

Verizon Bankruptcy Administration
500 Technology Drive, Suite 550
Weldon Spring, Missouri  63304
wfmelectronicbankruptcynotifications@
verizonwireless.com

WesBanco
Attn: Samuel Pulliam
1525 Pointer Ridge Place
Bowie, Maryland  20716
sgoldberg@mhlawyers.com

**The following parties received
CM/ECF notice of the filing:**

Steven L. Goldberg, Esquire
(sgoldberg@mhlawyers.com)
Counsel for WesBanco Bank
McNamee Hosea
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  20770

Catherine Keller Hopkin, Esquire
(chopkin@yvslaw.com)
Counsel for Debtors
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Patricia B. Jefferson, Esquire
(pjefferson@milesstockbridge.com)
Counsel for Chapman Property LLC
Miles & Stockbridge P.C.
100 Light Street, 7th Floor
Baltimore, Maryland  21202

Lisa Yonka Stevens, Esquire
(lisa.y.stevens@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770

US Trustee – Greenbelt
(ustpregion04.gb.ecf@usdoj.gov)
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770